UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| ROSEMARIE ANKNEY, | ) | CASE NO. C08-0666-MAT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Rosemarie Ankney proceeds through counsel in her appeal of a final decision of the Commissioner of the Social Security Administration (Commissioner). The Commissioner denied her application for Disability Insurance (DI) benefits after a hearing before an administrative law judge (ALJ). Having considered the ALJ's decision, the administrative record (AR), and all memoranda of record, the Court recommends REMANDING this matter for further administrative proceedings.

/ / /

/ / /

/ / /

REPORT AND RECOMMENDATION
PAGE -1

# I. FACTS AND PROCEDURAL HISTORY

Ms. Ankney was born on XXXX, 1955.[1]  After receiving a high-school equivalency diploma (GED), she attended cosmetology training with some business classes, became a licensed cosmetologist, and received a certification in office skills.  (AR 208, 340.)  Her prior work experience includes twenty-two years of employment at Airborne Airfreight in various positions, including as a receptionist, a customer service clerk, a pricing clerk, and an executive assistant. (AR 342-43, 346.)  Ms. Ankney was last gainfully employed as an assistant to the president of Airborne in April 2004, at which time she was laid off due to the company's acquisition by DHL. (AR 341.)

Ms. Ankney is insured for DI benefits through December 31, 2009.  (AR 14.)  In January 2005, she protectively filed an application for DI benefits.  (AR 56-61.)  Ms. Ankney alleged disability with an onset date of November 1, 2004, due to morning nausea and vomiting; chronic fatigue; difficulty with focusing attention; abdominal and back pain; difficulty in getting up and down, sitting and typing on a computer, and walking; blurred vision; and urinary frequency.  (AR 344-45, 353-55.)  According to Ms. Ankney, these symptoms are the result of the combined effects of  juvenile diabetes with retinopathy and cataracts, depression, hepatitis C, obesity, and her status after coronary artery bypass graft surgery.  (AR 50, 54, 72-73, 134, 343-57.)  Her application was denied at the initial level and on reconsideration, and she timely requested a hearing.

---

[1] Ms. Ankney's date of birth is redacted back to the year of birth in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

01　　　　On January 23, 2007, an ALJ held a hearing, taking testimony from Ms. Ankney, medical

02　expert (ME) Dr. John Lindberg, and vocational expert (VE) Michael Swanson. (AR 337-67.) On

03　June 29, 2007, the ALJ issued a decision finding plaintiff not disabled. (AR 18.) Ms. Ankney's

04　timely administrative appeal of the ALJ's decision was denied by the Appeals Council (AR 4-6),

05　making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42

06　U.S.C. § 405(g). On April 28, 2008, Ms. Ankney timely filed the present action challenging the

07　Commissioner's decision. (Dkt. 1.)

08 **II.  JURISDICTION**

09　　　　Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. § 405(g).

10 **III.  STANDARD OF REVIEW**

11　　　　Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of

12　social security benefits when the ALJ's findings are based on legal error or not supported by

13　substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir.

14　2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such

15　relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

16　*Richardson v. Perales*, 402 U.S. 389, 201 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th

17　Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical

18　testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d

19　1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may

20　neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas*

21　*v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than

22　one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

01    The Court may direct an award of benefits where "the record has been fully developed and

02 further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298

03 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).

04 The Court may find that this occurs when:

05         (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's
        evidence; (2) there are no outstanding issues that must be resolved before a
06         determination of disability can be made; and (3) it is clear from the record that the
        ALJ would be required to find the claimant disabled if he considered the claimant's
07         evidence.

08 *Id*. at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that

09 erroneously rejected evidence may be credited when all three elements are met).

10                              **IV. EVALUATING DISABILITY**

11         As the claimant, Ms. Ankney bears the burden of proving that she is disabled within the

12 meaning of the Social Security Act (Act). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999)

13 (internal citations omitted). The Act defines disability as the "inability to engage in any substantial

14 gainful activity" due to a physical or mental impairment which has lasted, or is expected to last,

15 for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A claimant

16 is disabled under the Act only if her impairments are of such severity that she is unable to do her

17 previous work, and cannot, considering her age, education, and work experience, engage in any

18 other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A)*see*

19 *also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

20         The Commissioner has established a five-step sequential evaluation process for determining

21 whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520,

22 416.920. The claimant bears the burden of proof during steps one through four. At step five, the

01 burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in the

02 sequence, the inquiry ends without the need to consider subsequent steps.

03      Step one asks whether the claimant is presently engaged in "substantial gainful activity."

04 20 C.F.R. §§ 404.1520(b).[2] If she is, disability benefits are denied. If she is not, the

05 Commissioner proceeds to step two. At step two, the claimant must establish that she has one or

06 more medically severe impairments, or combination of impairments, that limit her physical or

07 mental ability to do basic work activities. If the claimant does not have such impairments, she is

08 not disabled. 20 C.F.R. §§ 404.1520(c). If the claimant does have a severe impairment, the

09 Commissioner moves to step three to determine whether the impairment meets or equals any of

10 the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d). A claimant whose

11 impairment meets or equals one of the listings for the required twelve-month duration requirement

12 is disabled. *Id.*

13      When the claimant's impairment neither meets nor equals one of the impairments listed in

14 the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual

15 functional capacity (RFC). 20 C.F.R. §§ 404.1520(e). Here, the Commissioner evaluates the

16 physical and mental demands of the claimant's past relevant work to determine whether she can

17 still perform that work. 20 C.F.R. §§ 404.1520(f). If the claimant is able to perform her past

18 relevant work, she is not disabled; if the opposite is true, then the burden shifts to the

19 Commissioner at step five to show that the claimant can perform other work that exists in

20

---

21    [2] Substantial gainful activity is work activity that is both substantial, i.e., involves
significant physical and/or mental activities, and gainful, i.e., performed for profit. 20 C.F.R. §
22 404.1572.

01  significant numbers in the national economy, taking into consideration the claimant's RFC, age,

02  education, and work experience.  20 C.F.R. § 404.1520(g); *Tackett*, 180 F.3d at 1099, 1100.  If

03  the Commissioner finds the claimant is unable to perform other work, then the claimant is found

04  disabled and benefits may be awarded.

## V.  DECISION BELOW

In concluding that Ms. Ankney is not disabled, the ALJ found as follows:

1.  **Step One:** Ms. Ankney has not engaged in substantial gainful activity since the alleged onset date of November 1, 2004.

2.  **Step Two:** Ms. Ankney suffers from the severe impairments of juvenile diabetes, hepatitis C, moderate obesity, and status post coronary artery bypass graft.

3.  **Step Three:** Ms. Ankney does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  **Step Four:**

    a.  Ms. Ankney has the RFC to perform sedentary work activities, i.e., to lift and/or carry up to 10 pounds occasionally but less than 10 pounds frequently; to stand and/or walk up to 2 hours out of an 8-hour workday; and to sit up to 6 hours out of an 8-hour workday.

    b.  Ms. Ankney is capable of performing past relevant work as a customer service clerk and as a pricing clerk.

5.  **Step Five:** Alternatively, even if Ms. Ankney were limited to unskilled work, she would still be "not disabled" under the framework of Medical-Vocational Rules 201.14 and 201.21.

(AR 12-18.)

## VI.  ISSUES ON APPEAL

Ms. Ankney raises the following issues on appeal:

1. Did the ALJ err by improperly assessing Ms. Ankney's RFC? (Step Four)

2. Did the ALJ err by finding Ms. Ankney's testimony to be not entirely credible? (Steps Two and Four)

3. Did the ALJ err by relying improperly on the VE's testimony and failing to make a specific finding regarding the physical and mental demands of her past relevant work? (Step Four)

4. With respect to his alternative finding, did the ALJ err by failing to find Ms. Ankney disabled as of her 50th birthday? (Step Five)

(Dkt. 14 at 1.) She asks the Court to reverse the Commissioner's decision and to remand this case for an award of disability benefits or, alternatively, to remand for further administrative proceedings. (Dkt. 14 at 16.)

## VII. DISCUSSION

**A.     Medical Opinions and the Assessment of Ms. Ankney's RFC**

A determination of disability requires consideration of the medical opinions in the record. 20 C.F.R. §§ 404.1527 and 416.927.  *See also* Social Security Ruling (SSR) 96-5p ("The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.")  In general, more weight should be given to the opinion of a treating physician than to a non-treating physician, and more weight to the opinion of an examining physician than to a non-examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  An ALJ may reject contradicted opinions of treating or examining physicians with "'clear and convincing reasons'" and uncontradicted opinions with "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id*. at 830-31 (quoted sources omitted).  "'The ALJ can meet this burden by setting out a detailed and thorough

summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Also, the Commissioner must consider the opinions of state agency medical and psychological consultants as opinions of nonexamining physicians and psychologists. SSR 96-6p ("[While not bound by them, ALJs and the Appeals Council] may not ignore these opinions and must explain the weight given to the opinions in their decisions.")

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the Court credits] that opinion as 'a matter of law.'" *Lester*, 81 F.3d at 834 (finding that, if doctors' opinions and plaintiff's testimony were credited as true, plaintiff's condition met a listing) (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989)). Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the evidence supports a finding of disability. *See*, *e.g.*, *Schneider v. Commissioner of SSA,* 223 F.3d 968, 976 (9th Cir. 2000) ("When the lay evidence that the ALJ rejected is given the effect required by the federal regulations, it becomes clear that the severity of [plaintiff's] functional limitations is sufficient to meet or equal [a listing.]"); *Smolen v. Chater*, 80 F.3d 1273,1292 (9th Cir. 1996) (holding that ALJ's reasoning for rejecting subjective symptom testimony, physicians' opinions, and lay testimony was legally insufficient; finding record fully developed and disability finding clearly required).

However, courts retain flexibility in applying this "'crediting as true' theory." *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there were insufficient findings as to whether plaintiff's testimony should be credited as true). As stated by one district court: "In some cases, automatic reversal would bestow a benefits windfall upon

01 an undeserving, able claimant." *Barbato v. Commissioner of SSA*, 923 F. Supp. 1273, 1278 (C.D.

02 Cal. 1996) (remanding for further proceedings where the ALJ made a good faith error, in that

03 some of his stated reasons for rejecting a physician's opinion were legally insufficient).

04 "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related

05 physical and mental activities in a work setting on a regular and continuing basis. A 'regular and

06 continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR

07 96-8p; *see* 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, an ALJ must assess all the

08 evidence (including the claimant's and others' descriptions of limitation, and medical reports) to

09 determine what capacity the claimant has for work despite her impairments. *See id.*; SSR 96-8p.

10 The ALJ considers a claimant's ability to meet physical and mental demands, sensory

11 requirements, and other functions. *See* 20 C.F.R.§§ 404.1545(b-d).

12 Ms. Ankney contends that the ALJ erred in finding her capable of working on a "regular

13 and continuing basis" because he failed to account for and develop the record regarding the impact

14 of hepatitis C on her symptoms of fatigue, alleged vision difficulties, her abdominal hernia, urinary

15 frequency, and carpel tunnel syndrome. (Dkt. 14 at 12-14.) She is correct as to the impact of

16 hepatitis C on her symptoms of fatigue. Although the ALJ left the record open in order to receive

17 the forthcoming results of Ms. Ankney's liver biopsy, he failed to discuss how those results

18 squared with ME's uncontradicted opinion that hepatitis C may have caused liver damage and

19 consequent, debilitating fatigue. Ms. Ankney is, however, incorrect with respect to the other

20 alleged impairments because the record does not adequately support her contention that those

21 conditions led to an inability to perform past, relevant work. The Court, therefore, recommends

22 remanding to the ALJ so that he may submit the liver biopsy results to the ME and consider the

01 impact of those results on Ms. Ankney's RFC.

02       **1.      Hepatitis C, Fatigue, and the Liver Biopsy**

03       The ALJ appeared to accept the ME's uncontradicted opinion that Ms. Ankney's hepatitis

04 C may be causing debilitating fatigue, requested that the results of a forthcoming liver biopsy be

05 sent to him immediately, and then ultimately did not discuss the results of the liver biopsy and their

06 impact on his decision. In response to the ALJ's question about whether a person with Ms.

07 Ankney's medical history could complete a normal work week on a regular and consistent basis,

08 the ME Dr. Lindberg responded:

09       I think it is possible, but now I'm reading something we don't know and that is more
      recent evaluations of her liver function, *the liver biopsy, the – and the status of her*
10       *liver condition at the present time even though her liver function is within*
      *satisfactory limits. The fatigue can impair a person continuing in a 40 hour a week*
11       *work week.*

12 (AR 361 (emphasis added).) Shortly thereafter, the following exchange occurred:

13     ALJ:      So doctor, you would – you'd like to know what – why she got sent
                     over to Harborview [Medical Center] and what these lab tests are and
14                     what the result of the liver biopsy is?

15     ME:      Except I think that at the present time, the liver situation may be the
                    major situation . . . . [F]ollowing up the hepatitis C is the major –
16
    ALJ:      You go back on the thirty-first?
17
    CLMT:    Pardon me?
18
    ALJ:      You go back on the thirty first?
19
    CLMT:    Yes.
20

21 (AR 365.) The ALJ then directed that the record remain open until March 2007, so that he could

22 receive "the liver biopsy. . . . liver function tests and anything else you can give me regarding

01 functional capacity." (AR 366.)

02    On April 19, 2007, Ms. Ankney's counsel faxed the ALJ three pages of results from

03 Harborview Medical Center. (AR 334-36.) The first page was the liver biopsy report of a sample

04 taken on January 31, 2007. (AR 334.) The final diagnosis was "1. Chronic hepatitis consistent

05 with hepatitis C (grade 2, stage 2, Batts & Ludwig)," and "2. Minimal macro- and microvesicular

06 steatosis." (*Id.*) The pathologist explained that diagnosis as follows:

07    The liver biopsy demonstrates mild portal and lobular chronic inflammation, scant
    areas of necrosis and mild periportal fibrosis. In addition, there is minimal fatty
08    change and perisinusoidal fibrosis suggestive of a component of streatohepatitis of
    drug/toxin effect. The special stain for Gomori trichrome highlights the areas of
09    fibrosis. The reticulin stain highlights areas of central perisinusoidal fibrosis. The
    special stain for iron is negative.

10

11 (*Id.*) The second and third pages of the facsimile were the results from blood tests on Ms. Ankney

12 in September and December of 2006 and January of 2007, the most comprehensive being from

13 September 2006. (AR 335-36.)

14    When the ALJ issued his decision on June 29, 2007, he cited the blood tests in support of

15 his finding that Ms. Ankney did not suffer from debilitating fatigue as a result of her hepatitis C.

16 (AR 17.) The ALJ did not, however, discuss the relevance of the liver biopsy or even

17 acknowledge the existence of the biopsy results. His full discussion of the role of hepatitis C on

18 Ms. Ankney's alleged disability was as follows:

19    The record does indicate findings consistent with hepatitis C, which results in some
    fatigue (Exhibit 16F/3-4). The claimant's liver function test, however, specifically her
20    bilir[u]bin and albumin levels, were in the normal range. An October 28, 2005
    treatment note indicates that the claimant reported not having checked her hepatitis
21    C in quite some time, which indicates that it is not as severe as alleged (Exhibit

22

01  11F/18).[3]  A July 26, 2006 treatment note indicated that the claimant's liver
    bloodwork looked "good" (Exhibit 9F/2).  A December 26, 2006 treatment note
02  indicated that the claimant was told that her liver was okay (Exhibit 15F/6).[4]  There
    is no indication that hepatitis C limits the claimant to less-than-sedentary exertional-
03  level work.

04  (*Id.*)  Thus, although Dr. Lindberg testified that the liver biopsy would enlighten him on the role

05  of hepatitis C on Ms. Ankney's fatigue "even though her liver function is within satisfactory

06  limits," (AR 361), the ALJ found that Ms. Ankney suffered no debilitating fatigue because her

07  blood work showed her liver function was within satisfactory limits.

08  Ms. Ankney is correct that the ALJ may not request evidence that relates directly to the

09  question of disability and then choose not to assess it.  An ALJ has a duty to "fully and fairly"

10  develop the record.  *Smolen*, 80 F.3d at 1288.  Here, the ALJ could not have offered specific and

11  legitimate reasons to reject the ME's uncontradicted opinion on the role of Ms. Ankney's hepatitis

12  C on her fatigue in the absence of an evaluation of the liver biopsy results.        *See Mayes v.*

13  *Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (stating that an ALJ has a duty to develop the

14  record further when the evidence is ambiguous or inadequate for a proper evaluation).

15  The Commissioner contends that "[i]t was not necessary for the ALJ to develop the record

16  because the findings from the surgical pathology report indicated only mild changes."  (Dkt. 18

17  at 8.)  According to the Commissioner, because Ms. Ankney's physician suggested that "[i]f her

18  _____

19  [3] This statement is best examined in full context.  The October 2005 treatment note states:
    "She has hepatitis C and says that she has not been checked in quite some[]time.  She was told that
20  she needed a biopsy, but was unable to do this because her coronary artery disease was discovered
    at about the same time."  (AR 261.)

21  [4] The 2006 treatment note actually states, "In 1990, she had a liver biopsy and was told
    'the liver was okay.'"  The results of a 1990 liver biopsy shed little light upon the current status
22  of Ms. Ankney's liver.

01 liver biopsy returns with a stage 2 or less, [they] would not approach treatment," if the ALJ erred

02 at all, his omission constituted harmless error. (*Id.*; AR 327.) The Commissioner's position

03 actually underscores the inadequacy of the record on this issue. A physician's choice not to treat

04 an acknowledged medical condition does not always imply the absence or insignificance of

05 symptoms.[5] Without additional testimony or evaluation it is thus not possible to credit the

06 Commissioner's assertion that "[p]laintiff's biopsy results were consistent with the medical

07 evidence." (Dkt. 18 at 8.) As one study noted, "[a] number of pitfalls can be encountered in the

08 interpretation of common blood liver function tests. These tests can be normal in patients with

09 chronic hepatitis or cirrhosis." David E. Johnston, *Special Considerations in Interpreting Liver*

10 *Function Tests*, American Family Physician (Apr. 15, 1999), *located at*

11 http://www.aafp.org/afp/990415ap/2223.html (last visited Jan. 6, 2009) (quoting abstract) (also

12 describing how overall hepatic function can be assessed by applying the values for albumin,

13 bilirubin and prothrombin time in the modified Child-Turcotte grading system); *see also* C J

14 Healey, et al., *Liver histology in hepatitis C infection: a comparison between patients with*

15 *persistently normal or abnormal transaminases*, 37 Gut: An International Journal of

16 Gastroenterology and Hepatology 274-78 (1995), *abstract available at*

---

18      [5] There are instances, such as with terminal illness, that physicians recommend palliative
19 care to improve their patients' quality of life over more invasive procedures that might halt the
progression of the disease. *See generally* World Health Organization, *WHO Definition of*
20 *Palliative Care*, *located at* http://www.who.int/cancer/palliative/definition/en/ (last visited Jan. 6,
2009). Here Ms. Ankney's physician stated that in light of a stage 2 result from the liver biopsy,
21 "[t]he patient and I both agree that treatment would not be our first choice due to her other health
concerns." (AR 327.) This statement could imply that treatment would cause a decrease in her
22 quality of life as much as it could imply that her liver condition is not the source of significant
symptoms.

01  http://gut.bmj.com/cgi/content/abstract/37/2/274 (last visited Jan. 6, 2009) ("[S]ignificant liver

02  pathology (chronic persistent hepatitis or chronic active hepatitis) was found in nine of 19 (47%)

03  of cases with repeatedly normal transaminases.  Liver biopsy is advised in all cases of chronic

04  hepatitis C infection to accurately assess both the degree of fibrosis and the current activity of the

05  disease.") (quoting abstract).  That is, a patient could have liver blood work that falls into a normal

06  range and yet still suffer from significant liver damage.  This is why the ALJ left the record open

07  after the ME's testimony, and yet the ALJ cited the blood work as a reason for rejecting Ms.

08  Ankney's complaints of fatigue related to hepatitis C without discussing possible contradictions.

09          Ms. Ankney's pathologist employed the Batts and Ludwig staging and grading system for

10  evaluating chronic hepatitis and specified Grade 2, Stage 2 damage. [6] (AR 334.)  That is, Ms.

11  Ankney suffers from periportal fibrosis (Stage 2), which is considered "mild" (Grade 2) because

12  it involves some or all portal tracts in piecemeal necrosis along with "mild" lobular inflammation,

13  necrosis, and hepatocellular damage. Rahn, *supra* note 6, at 111.  Although her pathologist

14  indicated what he would do in the event of a Stage 2 result, he gave no indication of what he

15  would be done in the event of a *Grade* 2 result, and there is no indication that all grades of liver

16  damage should be treated in the same manner.  It is plausible that a physician might treat a Grade

17  0 (portal inflammation only, without lobular or piecemeal necrosis), Stage 2 result conservatively

18  but treat a Grade 4 (severe piecemeal necrosis, bridging necrosis, severe/prominent lobular

19  _____

20          [6] Batts and Ludwig scores range from 0 to 4: the *grade* measures the degree and location
    of inflammation (0 = portal inflamation only (no lobular or piecemeal necrosis); 4 = severe, with
21  bridging necrosis and severe inflammation/prominent necrosis, diffuse hepatocellular damage); the
    *stage* measures the extent of the fibrosis, provides an etiology based on the biopsy, and suggests
22  clinical information (0 = no fibrosis; 4 = cirrhosis).  Shelley B. Rahn, *Liver Biopsy Interpretation
    in Chronic Hepatitis*, 33 J. Ins. Med. 110, 110-11 (2001).

01 inflammation and diffuse hepatocellular damage), Stage 2 result more aggressively. Similarly, the

02 record does not indicate how rapidly the damage to Ms. Ankney's liver has progressed, which also

03 may factor into a physician's treatment recommendations.[7]

04       The record is not fully and fairly developed with respect to whether Ms. Ankney is capable

05 of working on a regular and continuous basis due to debilitating fatigue because the ALJ did not

06 provide specific and legitimate reasons backed by substantial evidence for rejecting the ME's

07 uncontradicted opinion that the liver biopsy results might elucidate the source and severity of her

08 condition. The Court therefore recommends remanding to the ALJ for further development of the

09 record, which should include the submission of the most recent liver biopsy results to the ME and

10 a discussion of the liver biopsy results. The ALJ should consider any updated medical evidence

11 with respect to Ms. Ankney's liver damage and hepatitis C, as well as any follow-up tests

12 regarding liver function, if any, that are recommended by the ME or treating physicians.

13     **2.**     **Vision Difficulties, Abdominal Hernia, Urinary Frequency, and Carpal**
14         **Tunnel Syndrome**

15       Ms. Ankney argues that the ALJ should have further developed the record about her

16 alleged vision difficulties, and that he failed to consider her abdominal hernia, urinary frequency,

17 and carpal tunnel syndrome. The Commissioner responds that the ALJ's treatment of these

18 impairments was adequate because the severity of her subjective complaints[8] was not supported

19

20      [7] For example, if Ms. Ankney's scores were Grade 0, Stage 0 in 1990, a physician might
opine that the damage has progressed slowly. If her scores were Grade 0, Stage 0 in 2006, the
21 same physician might conclude that the damage has spread quickly.

22      [8] The ALJ's determination of Ms. Ankney's credibility is discussed in greater detail in the
following section.

01 by the medical evidence and did not, in any event, suggest a more limited RFC than the one

02 assessed. The Commissioner is correct that the record does not necessitate a more detailed

03 assessment of these maladies.

04 The ALJ took testimony about Ms. Ankney's vision problems both from Ms. Ankney and

05 the ME. (AR 353-55, 357-58.) Ms. Ankney's vision was last evaluated in 2004. (AR 357.) At

06 that time, she had 20/20 vision in both eyes, her diabetic retinopathy had been stable for eight

07 years, and her healthcare provider stated that the "mild retinopathy seen 2 years ago was gone."

08 (AR 121, 285, 355, 357-58.) At the 2007 hearing before the ALJ, Ms. Ankney complained about

09 vision difficulties that she attributed to retinopathy and cataracts. She stated, "[m]y vision has

10 gotten fuzzy – fuzzier. I used to be able to read without my glasses at least a little bit and now

11 I can't. Even with my glasses, it's still kind of fuzzy." (AR 355.) With respect to her distance

12 vision, she stated, "I used to be able to see the TV guide on the TV and I can't see it now unless

13 I'm right at the TV, you know." (*Id.*)

14 The ALJ did not err by not developing the record further with respect to Ms. Ankney's

15 vision difficulties. Ms. Ankney's testimony suggested little more than that she can read with

16 eyeglasses, her eyeglass prescription should be updated, and she has developed myopia. She

17 presented no evidence whatsoever that her vision difficulties contributed to an inability to perform

18 work-related activities.

19 With respect to Ms. Ankney's other maladies, both cumulatively and individually, the

20 Court is required to affirm the RFC determination if the ALJ applied the proper legal standard and

21 the decision is supported by substantial evidence. See *Morgan v. Commissioner of SSA*, 169 F.3d

22 595, 599 (9th Cir. 1999). The ALJ need not prepare a function-by-function analysis for medical

01 conditions or impairments that the ALJ found neither credible nor supported by the record.

02 *Bayliss v. Barnhart* , 427 F.3d 1211, 1217 (9th Cir. 2005); *see* SSR 96-8p (defining RFC); *see*

03 *generally* 20 C.F.R. § 404.1529(c) (setting forth criteria for evaluating the intensity and

04 persistence of symptoms); SSR 96-7p (setting forth criteria for evaluating symptoms and

05 credibility).

06       Although the ALJ took testimony about Ms. Ankney's abdominal hernia, urinary

07 frequency, and carpal tunnel syndrome (AR 351, 353, 356-57), he considered them in his decision

08 more broadly as other factors concerning her functional limitations and restrictions due to pain or

09 other symptoms. (AR 16-17.) The ALJ found that although Ms. Ankney's medically determinable

10 impairments could be expected to produce some of her alleged symptoms, her subjective

11 complaints concerning the intensity, persistence, and limiting effects of these symptoms were not

12 entirely credible. (AR 17.) The ALJ noted that Ms. Ankney's chief complaints were "abdominal

13 pain, nausea, fatigue and difficulty concentrating." (*Id.*) He then concluded that neither pain nor

14 any other impairment inhibited Ms. Ankney's ability to perform work consistent with a sedentary

15 RFC. (*Id.*) In doing so, the ALJ rejected the State Agency Physical RFC Assessment finding that

16 Ms. Ankney was capable of performing more strenuous, light exertional-level work because the

17 State Agency finding failed to adequately consider her obesity and subjective complaints, and was

18 not consistent with the record. (*Id.*)

19       With respect to the abdominal hernia, the medical treatment notes indicated that Ms.

20 Ankney's resultant pain was controlled by medication. (AR 322-25.) In May 2006, the treatment

21 notes indicated that she had not needed pain medication for three months but had requested it

22 because she planned on taking an outdoor trip where she would do "more exertion-type activity

01 and would like to have medication just in case." (AR 325.) In December 2006, the treatment

02 notes indicated that her abdominal pain was helped by a proton pump inhibitor. (AR 326.)

03        With respect to urinary frequency, Ms. Ankney's complaints about the condition (AR 356)

04 were not supported by any indications that it impaired her capability to perform sedentary work.

05 The ME noted that while at the hearing she referred to symptoms related to her bladder, the

06 medical record revealed a kidney issue related to her coronary bypass surgery, and her kidneys

07 appeared to have regained full function since that time. (AR 358.)

08        With respect to carpal tunnel syndrome, Ms. Ankney testified that she had difficulty using

09 her hands, and a single treatment note from May 2006 mentioned that the numbness and tingling

10 in her hands were consistent with carpal tunnel syndrome. (AR 325, 353.) Nevertheless, the May

11 2006 note also mentioned that the symptoms occurred "when she wakes up in the morning" and

12 "she thinks its because she sleeps with her wrist bent and lying on her wrists." (AR 325, 353.)

13 The record contains no other support for Ms. Ankney's assertion that she experienced continued

14 difficulties with her hands or wrists or that her ability to work either as a customer service clerk

15 or as a pricing clerk would be impaired.

16        In making his RFC determination the ALJ need not have considered in greater detail Ms.

17 Ankney's abdominal hernia, urinary frequency, and carpal tunnel syndrome because the severity

18 of these subjective complaints was not supported by record. *See Bayliss*, 427 F.3d at 1217 .

19 Rather, the ALJ applied the proper legal standard and his decision that these maladies did not limit

20 Ms. Ankney to less-than-sedentary exertional-level work was supported by substantial evidence,

21 including, among other factors, her daily activities, work record, the ME's testimony, and her

22 symptoms as reflected in the medical record. (AR 17.) The Court therefore recommends

01 affirming the ALJ's findings with respect to the role of these other alleged impairments on Ms.

02 Ankney's RFC.

**B.       Assessment of Ms. Ankney's Credibility**

04       Absent evidence of malingering, an ALJ must provide clear and convincing reasons to

05 reject a claimant's testimony. *See Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir.2001). In

06 finding a social security claimant's testimony unreliable, an ALJ must render a credibility

07 determination with sufficiently specific findings, supported by substantial evidence. "General

08 findings are insufficient; rather, the ALJ must identify what testimony is not credible and what

09 evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. "In weighing a claimant's

10 credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his

11 testimony or between his testimony and his conduct, his daily activities, his work record, and

12 testimony from physicians and third parties concerning the nature, severity, and effect of the

13 symptoms of which he complains." *Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997); *see* 20

14 C.F.R. § 404.1529(c); *Smolen*, 80 F.3d at 1284-85; SSR 96-7p.

15       Ms. Ankney argues that the ALJ erred by partially rejecting her testimony.  More

16 specifically, she contends that the ALJ made an adverse credibility determination based on Ms.

17 Ankney's stated reasons for stopping work, his misinterpretation of medical evidence, and a lack

18 of medical treatment.  (Dkt. 14, at 10.)  The Commissioner responds that the ALJ properly

19 rejected Ms. Ankney's subjective symptom complaints because they were inconsistent with other

20 evidence in the record.  (Dkt. 18, at 4.)  According to the Commissioner, the ALJ drew negative

21 inferences regarding Ms. Ankney's credibility because she left work in 2004 for non-disability

22 related reasons and because there was evidence to support medication non-compliance.  (*Id.*)

01    First, Ms. Ankney contends that the ALJ should not have considered her credibility to be

02    lessened by her reasons for stopping work because she testified that she was absent from work

03    several times a month in the year before she left and only filed for disability months later when her

04    heart condition was discovered and her symptoms had worsened. While these are valid arguments,

05    the record does not demand that only Ms. Ankney's inferences from the facts be taken as true.

06    The ALJ found as follows:

07        The claimant has an excellent earnings record, which enhances her credibility. On the
         other hand, the claimant was laid off from her job and did not quit secondary to a
08        medical problem, which lessens the credibility of allegations of being unable to work.

09    (AR 16.) That is, the ALJ examined counterpoised inferences regarding Ms. Ankney's work

10    history: a positive one for her excellent earnings record and a negative one for not leaving work

11    despite having suffered from many of the same, longstanding medical issues as those raised in her

12    application for DI benefits. Ms. Ankney testified that she did not seek work after being laid-off

13    because she wanted to "take some time off and enjoy not working." (AR 349.) The ALJ need

14    not have weighed the fact that Ms. Ankney stopped work for non-medical reasons only in a

15    positive or an entirely neutral manner, and there is no indication that it was given an

16    inappropriately determinative weight. *See, e.g., Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir.

17    2001) (disregarding claimant's pain testimony because "(1). . . he left his job because he was laid

18    off, rather than because he was injured; (2) [he] waited nine months after he was laid off before

19    seeking any medical attention; and (3) [he] failed to seek treatment despite his complaints of

20    severe pain.").

21        Second, Ms. Ankney contends that the ALJ misinterpreted the medical evidence. As

22    discussed earlier, she is correct with respect to developing the evidence about and evaluating the

01   effect of hepatitis C on her liver condition and, consequently, her fatigue.  Although the ALJ

02   concluded that Ms. Ankney's credibility was undermined by an October 2005 medical note that

03   she "had not checked her hepatitis C in quite some time, which indicates that it is not as severe as

04   alleged" (AR 17), the same medical note indicated that a liver biopsy had not been performed the

05   previous year because her heart condition had been discovered (AR 261).  Similarly, the ALJ erred

06   by relying on a July 2006 medical notation that her blood work "looked good" and that she had

07   been told that her "liver was okay" in December 2006.  (AR 17.)  The July 2006 treatment note

08   did not account for the possibility that patients with hepatitis C can have severely damaged livers

09   yet return normal blood work (AR 361) and the December 2006 treatment note referred to a

10   statement made to Ms. Ankney in 1990 (AR 326).

11         Ms. Ankney is less persuasive with regards to the ALJ's assessment of lessened credibility

12   with respect to her status post-cardiac surgery, pain, and, with an important exception, medication

13   non-compliance.  (AR 16.)  "One strong indication of the credibility of an individual's statements

14   is their consistency, both internally and with other information in the case record."  SSR 96-7p.

15   Furthermore, an "individual's statement may be less credible if . . . the medical reports or records

16   show that the individual is not following the treatment as prescribed and there are no good reasons

17   for this failure."  *Id.*  With respect to any lingering effects from her heart condition, Ms. Ankney

18   reported, in September 2006, an ability to walk more than four blocks and up more than two

19   flights of stairs.  (AR 329.)  Her treating cardiologist concluded that her heart condition was

20   asymptomatic.  (AR 330-31.)  The following month, Ms. Ankney reported to her primary care

21   provider that she was without cardiac symptoms.  (AR 322.)  With respect to pain as the result

22   of her abdominal hernia, there is evidence that her pain responded well to medication and remained

01 | at a controllable level. (AR 322-25.) With respect to medication non-compliance, there is an

02 | indication that Ms. Ankney at times did not comply with treatment for certain chronic conditions.

03 | In November 2005, her hypertension could not be evaluated because she had not taken her

04 | medications that day. (AR 258.) In 2006, she acknowledged that she had medication non-

05 | compliance issues and that her blood pressure was difficult to control because she often forgot to

06 | take her medications.[9] (AR 329-32.)

07 |        Third, Ms. Ankney contends that the ALJ should not have found that her failure to seek

08 | medical treatment for depression, hepatitis C, and diabetes lessened her credibility. She is correct

09 | to the extent that the ALJ declined to consider the undisputed evidence that Ms. Ankney's

10 | financial circumstances inhibited her ability to treat her conditions as quickly, comprehensively,

11 | or aggressively as she and her treating physicians would have preferred. In October 2004, prior

12 | to the discovery of Ms. Ankney's heart condition, her primary care physician Dr. Norman Seaholm

13 | noted that "one way or another we need to keep her insured given her current issues." (AR 286.)

14 | Dr. Seaholm later noted, after a specialist had performed coronary bypass graft surgery on Ms.

15 | Ankney, that she had "given up COBRA so is not covered for services other than surgical follow

16 | up." (AR 270.) Ms. Ankney left Dr. Seaholm's care to be seen on a sliding-scale at Community

17 | Health Clinic due to her lack of insurance and inability to pay. (AR 250, 311, 354.) In May 2006,

18 | her new healthcare provider noted that Ms. Ankney had not consulted a surgeon about her

19 | abdominal hernia because she was uninsured. (AR 325.) This physician chose to wait a month

---

[9] The record thus suggests that her medication non-compliance predates her present lack of insurance and employment and has not always been related to her financial circumstances. (*See, e.g.*, AR 329.) However, as discussed below, it appears that Ms. Ankney's ability to take her medication is also presently inhibited by an inability to afford them. (*See, e.g.*, AR 322, 329.)

01 before making referrals for Ms. Ankney's chronic conditions so that it would be clear whether Ms.

02 Ankney would be covered or needed to pay on a sliding scale. (*Id.*) In September 2006, her

03 physician noted that Ms. Ankney had, in the past, forgotten to take her medications, which was

04 "compounded by her lack of insurance or income which has delayed some of her medical care."

05 (AR 329; *see also* AR 41.) A disability claimant cannot be denied benefits for failing to obtain

06 medical treatment that would ameliorate his condition if she cannot afford that treatment. *Gamble*

07 *v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). Similarly, it was inappropriate for the ALJ to find

08 that Ms. Ankney's credibility was lessened by relying upon her failure to seek medical treatment

09 without also considering the impact of her inability to pay for treatment.[10]

10 In footnotes, Ms. Ankney also complains that the ALJ erred by rejecting Dr. Seaholm's

11 opinion in a November 2005 letter. (Dkt. 14, at 12 n.2; Dkt. 19, at 3 n.1.) Dr. Seaholm stated

12 as follows:

13 > [Ms. Ankney] has a number of chronic medical conditions that will likely preclude her
> from working, including Type 1 Diabetes that is not optimally controlled,
14 > hypertension, hyperlipidemia, coronary artery disease, and chronic active Hepatitis C.
> At this time she is unable to afford the medications or the evaluations required to
15 > manage these conditions which will likely lead to a gradual deterioration in her
> functional capacity. *I cannot comment on her current ability to work as I have not*
16 > *seen her in the office for over 9 months*, but I can say clearly that her *future* abilities
> will be severely compromised if these medical issues go unchecked.

17

---

18 [10] Thus, Ms. Ankney is correct that the ALJ erroneously found that her lack of psychiatric
treatment lessened her credibility regarding the severity of her mental impairment and symptoms.
19 (AR 15.) Furthermore, as the Ninth Circuit has noted, an ALJ cannot discredit a diagnosis of
depression based on a claimant's failure to seek treatment for it: by some counts, two-thirds of the
20 17 million adults nationwide who suffer from depression every year do not seek treatment. *See*
*Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996). Ms. Ankney does not, however,
21 specifically challenge the ALJ's other reasons for concluding that Ms. Ankney's mental impairment
is not severe, which include the State Agency Psychiatric Review Technique form as well as
22 statements by a friend about her abilities to problem-solve and interact with co-workers. (AR 14.)

It is my understanding that . . . her liver function has deteriorated, and that she has developed a hernia . . . . These will also likely need intervention *but that information should be obtained from her current treating physician.*

(AR 41 (emphases added).) In giving minimal weight to Dr. Seaholm's opinion, the ALJ found that Dr. Seaholm could not comment on Ms. Ankney's current ability to work, had not treated her recently, and did not refer to specific support in the record.[11] (AR 17.) To the extent that the ALJ rejected Dr. Seaholm's ultimate conclusion—and Dr. Seaholm himself appears to have suggested a possible *future* disability rather than a present one—the ALJ supported his conclusion, except as noted, with specific and legitimate reasons for doing so. For example, the ALJ referred to Ms. Ankney's performance of daily activities that are consistent with sedentary work, to medical evidence that Ms. Ankney's heart condition was largely asymptomatic, and to the lack of medical evidence that pain interfered with her ability to concentrate or to perform sedentary work. (AR 16-17.)

The Court notes that the ALJ did not entirely reject Ms. Ankney's subjective complaints; rather, the ALJ questioned her statements concerning the "intensity, persistence and limiting effects of these symptoms." (AR 17.) In fact, the ALJ gave more credence to Ms. Ankney's subjective complaints than he did to the contradictory State Agency Physical RFC Assessment that found her capable of performing more strenuous work. (*Id.*) Nevertheless, because the Court recommends remanding with respect to other issues, the Court recommends that the ALJ revisit his credibility assessment in order to consider (a) Ms. Ankney's complaints of fatigue related to

---

[11] Ms. Ankney notes that Dr. Seaholm treated her for several months during her claimed period of disability. (Dkt. 14, at 12 n.2; Dkt. 19, at 3 n.1.) Dr. Seaholm did not, however, state that he considered her to be disabled during that time or that she was unable to perform sedentary work.

01 hepatitis C and liver damage, and (b) her inability to pay for treatment.

02 **C.     Vocational Expert Testimony and Specific Findings Regarding Past Relevant Work**

03     Ms. Ankney contends that the ALJ's step four finding was unsupported by the evidence

04 and contrary to the law because the VE was not properly sworn in pursuant to 20 C.F.R. §

05 404.950(e) and the ALJ did not sufficiently analyze whether she was capable of performing past

06 relevant work. (Dkt. 14 at 14-15.) The Commissioner concedes that the VE was not properly

07 sworn in as a witness but argues that any error the ALJ committed by relying on the VE's

08 testimony was harmless because the undisputed evidence shows that Ms. Ankney had previously

09 worked as a customer service clerk, Dictionary of Occupational Titles (DOT) # 241.367-014

10 (sedentary, skilled), and as a pricing clerk, DOT # 216.382-034 (sedentary, semi-skilled). (Dkt.

11 18, at 11); *see* U.S. Dep't of Labor, Dictionary of Occupational Titles (DOT), App. C, ##

12 216.382-034 (Cost-Clerk), 241.367-014 (Customer-Complaint Clerk) (4th ed. 1991).  The

13 Commissioner is correct.

14     An ALJ's decision will not be reversed for harmless errors. *See Burch v. Barnhart*, 400

15 F.3d 676, 679 (9th Cir. 2005).  Few errors could be as harmless as the one committed here.  Ms.

16 Ankney was represented by counsel at her hearing, and that counsel received notice that Michael

17 Swanson would be testifying as a VE (AR 25) along with a copy of Mr. Swanson's resume (AR

18 33).  The ALJ asked Ms. Ankney's counsel if she objected to taking testimony from the VE, and

19 she responded, "No." (AR 342.)  After the VE's testimony, the ALJ asked Ms. Ankney's counsel

20 if she contested any of the conclusions, to which counsel responded, "No."  (AR 344.)  In

21 disability hearings, "strict rules of evidence, applicable in the courtroom, are not to operate so as

22 to bar the admission of evidence otherwise pertinent," and the emphasis is upon the informal rather

REPORT AND RECOMMENDATION
PAGE -25

01 than the formal so long as the proceedings are fundamentally fair. *Richardson v. Perales*, 402

02 U.S. 389, 400 (1971). The ALJ offered Ms. Ankney's counsel ample opportunity to cross-

03 examine the VE, but counsel declined. *See generally Copeland v. Bowen*, 861 F.2d 536, 539 (9th

04 Cir. 1988) ("A claimant in a disability hearing is not entitled to unlimited cross-examination, but

05 is entitled to such cross-examination as may be required for a full and true disclosure of the

06 facts."). Ms. Ankney does not dispute that she worked for twenty-two years as a customer service

07 clerk and as a pricing clerk, does not challenge the applicability of the relevant DOT job

08 classifications, and does not contend that her work as actually performed differed from the

09 classifications. The ALJ did not simply rely upon a generic classification of her past work or

10 emphasize only one facet of her job duties. *See, e.g.*, *Carmickle v. Commissioner of SSA*, 533

11 F.3d 1155, 1166-67 (9th Cir. 2008). Rather, the ALJ relied upon the VE's testimony and Ms.

12 Ankney's consistent testimony to find that Ms. Ankney had performed past relevant work

13 identified by specific DOT numbers. (AR 18, 73-74, 341-44.)

14       The Court recommends affirming the ALJ's reliance upon the VE's testimony and the

15 ALJ's findings regarding past relevant work.

16 **D.       The ALJ's Alternative Findings at Step Five**

17       At step 5 of the sequential evaluation process, the burden shifts to the Commissioner to

18 show the claimant can perform other jobs that exist in the national economy. *Pinto v. Massanari*,

19 249 F.3d 840, 844 (9th Cir. 2001). To carry this burden, the Commissioner may rely either upon

20 VE testimony or the Medical-Vocational Guidelines (Grids), 20 C.F.R. pt. 404, subpt. P, app. 2.

21 *See Tackett*, 180 F.3d at 1099. Ms. Ankney contends that the ALJ erred in his step five

22 alternative holding because he failed to find that she was disabled as of her fiftieth birthday in

01  January 2005, as was required under Grids Rule 201.14, i.e., because she was closely approaching

02  advanced age and has no transferrable skills. (Dkt. 14, at 15-16.)  The Commissioner concedes

03  that the ALJ erred in making his step five finding. (Dkt. 18, at 10.)

04  The ALJ appears to have used the wrong birth date for Ms. Ankney and thereby misapplied

05  the Grids Rule 201.14. (*See* AR 18 (referring to a 2005 birth date rather than to a 1955 birth

06  date).)  If on remand the ALJ finds that Ms. Ankney is able to perform her past relevant work,

07  then this error was harmless because the ALJ would not be required to proceed to step five.  If

08  on remand the ALJ finds that Ms. Ankney is unable to perform her past relevant work, then he

09  must revisit his step five assessment.  The Court therefore recommends that the ALJ revisit his

10  step five finding only if further development of the administrative record warrants doing so.

## VIII.  CONCLUSION

12  For the foregoing reasons, the Court recommends that this case be REVERSED and

13  REMANDED to the Commissioner for further proceedings not inconsistent with the Court's

14  instructions.  With respect to reassessing RFC, the ALJ should develop the record about the liver

15  biopsy results, hepatitis C, and fatigue.  With respect to reassessing credibility, the ALJ should

16  discuss the new evidence and the impact of Ms. Ankney's inability to pay for treatment.  The ALJ

17  should then reevaluate his step four findings and, if necessary, his step five findings.  A proposed

18  order accompanies this Report and Recommendation.

19  DATED this <u>14th</u> day of January, 2009.

Mary Alice Theiler
United States Magistrate Judge